**SIGNAL OIL & GAS COMPANY et al.**

v.

**The BARGE W–701 et al.**

**Civ. A. No. 70–3491.**

United States District Court,
E. D. Louisiana.

April 18, 1979.

Henry J. Read, A. Gordon Grant, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for plaintiffs.

Brunswick G. Deutsch, Bertrand M. Cass, Jr., Deutsch, Kerrigan & Stiles, Frank C. Allen, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, P. A. Bienvenu, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for defendants.

JACK M. GORDON, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiffs, Signal Oil & Gas Company, Louisiana Land and Exploration Company, Amerada Hess Corporation and Marathon Oil Company (hereinafter referred to as "SLAM") initiated this admiralty action to recover damages sustained by a pipeline in which the SLAM group owns a 90% interest. Plaintiffs sued, among others, the Barge W–701, *in rem*; its owners, Wil-

liams-McWilliams Company, Inc. (hereinafter referred to as "Williams-McWilliams"); Sun Oil Company and Acquitane Oil Corporation (hereinafter referred to as "Sun"); and J. Ray McDermott and Company, Inc. (hereinafter referred to as "McDermott"). The issue of liability was tried June 4, 5 and 6, 1973. The Court entered its Findings of Fact and Conclusions of Law on December 13, 1974. The Fifth Circuit Court of Appeals affirmed those Findings and Conclusions in an unpublished per curiam opinion dated November 29, 1976, Appeal No. 75–2089. The damages portion of this case was then tried on February 27, 1978, after which the parties were given time to prepare post-trial memoranda and the matter was taken under submission. The Court now prepares to make Findings of Fact and Conclusions of Law on the issue of damages.

However, as a prelude to such Findings and Conclusions, the Court will first frame the issues before it in the context of what was determined on the liability issue. Since the original Findings and Conclusions were exhaustively detailed, the Court will only briefly recap them here, and refers the parties to the December 13, 1974 opinion for the minutia.

SLAM initially owned 100% of a 12¾ inch pipeline referred to as the Marathon pipeline, which received oil gathered at Signal Platform A, one of five platforms in Main Pass Blocks 305 and 306. From there, the oil was transported to the Getty Oil Company Terminal in Venice, Louisiana. In 1969, Sun owned and operated Sun Platform 1, located in Main Pass Block 293, adjacent to Main Pass Blocks 305 and 306. For the purpose of transporting to shore the petroleum produced by Sun Platform 1, Sun entered into an agreement with SLAM whereby Sun Purchased a 10% interest in SLAM's Marathon pipeline and SLAM agreed to allow Sun to connect by pipeline the Sun Platform 1 and the Marathon pipeline at Signal Platform A. Specifically, Sun was permitted to utilize one riser on Signal Platform A to tie its pipeline into the Marathon pipeline. The agreement between Sun and SLAM contained an indemnity and hold harmless clause in favor of SLAM.

In November, 1969, Sun contracted for McDermott to construct a 6–inch pipeline from Sun Platform 1 in Main Pass Block 293 to Signal Platform A in Main Pass Block 305. This contract contained an indemnity and hold harmless clause in favor of Sun, with certain exceptions provided for in clause 15 of the contract. In the course of performing its work under this contract, McDermott was using the derrick barge W–701, owned by Williams-McWilliams. Williams-McWilliams furnished the crew for the Barge W–701, including its captain, Norman Southon.

On December 18, 1969, the Barge W–701 was moved to Signal Platform A by the tug CHARLES J. CENAC, for work to be performed at Signal Platform A. Since the Barge W–701 was a dumb barge, it was always towed from place to place by the CHARLES J. CENAC. On December 20, 1969, the Barge W–701 was preparing to leave Signal Platform A when Captain Southon met with resistance in retrieving the barge's anchors. He therefore utilized a method known as "dogging" the anchor to retrieve the port bow anchor. Later that day an oil slick was sighted near Signal Platform A, which subsequent measures discovered was the result of a rupture in the Marathon pipeline at a point approximately 550 feet from the platform. Based on the evidence adduced at the liability trial, the Court found the sole proximate cause of the rupture in the Marathon pipeline to have been the negligence of Captain Southon in "dogging" the anchor.

Sun and McDermott were each found to be non-negligent with respect to the damage to the Marathon pipeline. However, Sun was found to be liable to SLAM for the damage on the basis of the indemnity clause in its contract with SLAM. McDermott, in turn, was found liable to Sun on the basis of its contractual indemnity agreement, except to whatever extent clause 15 would exempt any items of damage proven at the trial on damages. Faced with such potential liability by contract for the sole negli-

gence of Williams-McWilliams' employee, Captain Southon, both Sun and McDermott were found by the Court to be entitled to indemnity over against Williams-McWilliams on a theory of maritime tort indemnity. Thus, the ultimate disposition of the parties at the liability trial was that Williams-McWilliams was liable to SLAM in tort; Sun was liable to SLAM for contract indemnity, except to the extent it was a 10% owner of the damaged pipeline; McDermott was liable to Sun for contract indemnity, except to extent exempted by clause 15; and Williams-McWilliams was liable to both Sun and McDermott for tort indemnity.

At the trial on damages, SLAM sought to prove over a million dollars worth of damage incurred by the rupture of the Marathon pipeline. Various elements of damage were contested by the others, as well as SLAM's request for prejudgment interest at 13.4%, their alleged cost of borrowing money. Sun sought recognition as a 10% owner of the pipeline, and therefore, the damages. Williams-McWilliams sought to limit its liability to everyone to the value of the Barge W–701, under 46 U.S.C. 181, et seq. Everyone opposed the limitation, and the value of the vessel was contested. Alternatively, everyone sought a direct action against Williams-McWilliams' $5,000,000.00 umbrella policy under L.R.S. 22:655. Needless to say, the excess insurer claimed that L.R.S. 22:655 did not apply to its policy. McDermott sought to wriggle free of its contractual obligation to indemnify Sun, and many ingenious arguments were advanced by all concerned on the various issues presented. The Court will now attempt to create order out of the chaos with the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### 1.

SLAM presented invoices, cancelled checks and cash vouchers reflecting the total expenses related to the repair of the Marathon pipeline. These repair expenses amounted to $1,044,453.24. In addition to actual repair expenses, SLAM offered evidence of $71,781.38 in lost overhead and operating expenses for the period of time in which the repairs were conducted. Therefore, the total damages claimed as a result of the 1969 rupture in the Marathon pipeline amount to $1,116,234.62.

### 2.

The pipeline was repaired between December 21, 1969, and May 21, 1970. The bulk of the repair work was completed by February 26, 1970, when crude oil production flow was restored; the remainder was delayed until the Spring to obtain the benefit of more favorable weather and sea conditions.

### 3.

Due to the depth of the water and the size of the line, special engineering was required to formulate a procedure to make the repair. The broken end of the line leading to shore was initially lifted to the surface in a single catenary curve. In order to complete repairs, it was then necessary to install a 12–inch Cameron ASA 900 Ball Valve in the line and then use compressed air to force the ball down the line approximately 3,000 feet. This displaced water from the line and lightened it sufficiently to place the line over a stinger in a double catenary curve. Additional sections of pipe were then added to the line in order to reconnect it to the platform. It was necessary to leave the valve in the line because the valve had to be kept closed in order to maintain the air space in the line between the valve and the ball.

### 4.

After the line was repaired and back in the water, a 5–day hydrostatic test was conducted from February 18–23, 1970, during which the line was subjected to a static high-pressure test to determine the existence of any leaks. Chester Rybicki and Fletcher Graham had been supervising the repairs up until this point. Graham inspected the valve prior to lowering the pipe-

line back into the water and it appeared to be in good condition at that time. Rybicki was present during the running of the hydrostatic tests and they were satisfactorily performed, revealing the existence of no leaks. However, approximately one month later, on March 25, 1970, a leak was detected in the line. Inspection revealed that the leak was due to a broken grease fitting in the ball valve. Of the total cost claimed for repairing the pipeline, $77,149.27 resulted from the repair of the broken grease fitting. See, Exhibits P–40, 41, 43, 44 and 51.

5.

■ Both Rybicki and Graham explained that the internal seal of the valve is pressure actuated and that a static high-pressure test of this type would not necessarily have revealed the existence of the broken grease fitting. This is so because under actual operating conditions the internal seal in the valve is subjected to cyclical, not static, pressure conditions ranging from zero to approximately 200 p.s.i. It would therefore only be after several weeks of operation under these cyclical pressure conditions that small quantities of oil would begin to leak past the seal and out of the broken grease fitting. Similarly, Graham's physical inspection of the valve prior to the pipeline's being laid back onto the floor of the Gulf would not reveal any breakage which occurred only during that procedure. The most likely conclusion one could draw from the evidence adduced is that the grease fitting was broken during the course of returning the pipeline to the Gulf floor. Although defendants argued that since the hydrostatic tests were positive, there must have been an intervening cause of the breakage for which they are not responsible, there was no evidence presented which would support such a conclusion. Indeed, the preponderance of the evidence bears in the opposite direction. Accordingly, the Court finds that the $77,149.27 cost of repairing the valve was directly related to the repair of the pipeline itself and the plaintiffs are therefore entitled to include that amount in the total damages recoverable.

6.

■ After all direct pipeline repairs were completed, including the repair of the valve, and the Marathon pipeline was once more in the bed of the Gulf of Mexico, there existed at the point where the ball valve was located a rise, or protrusion, of the pipeline above the Gulf floor due solely to the existence of the ball valve. The ball valve, of course, existed solely because the pipeline had been ruptured by the anchor of the Barge W–701. Being desirous of an even pipeline with no protrusions, such as existed prior to the rupture, SLAM decided to bury that portion of the Marathon pipeline containing the ball valve. This was done, and of the total cost of repairs claimed by plaintiffs, the burying expenses amounted to $57,579.11. See, Exhibits P–39 and 49. Defendants argue that they should not be held liable for the cost of burying the valve because it was not necessary and was not directly related to the repairs of any damage actually caused by the anchor. To the contrary, the burying procedure was not only reasonable, but was necessary in order to restore the pipeline to the integrity of its pre-injury condition. The Court, therefore, holds that the plaintiffs are entitled to recover the cost of burying the ball valve.

7.

■ Based on the testimony of Kaye Adamson and Exhibits P–113 through P–117, the Court finds that SLAM incurred operating expenses and lost overhead in the total amount of $71,781.38 during the course of the repairs to the pipeline, and they are therefore entitled to recovery in that amount.

8.

■ In the original decision of December 13, 1974, the Court held that McDermott was liable to Sun in contractual indemnity, except to the extent that certain items of damage might be found to be exempted under clause 15 of their contract. That clause reads as follows:

15. Any provisions herein to the contrary notwithstanding, Contractor [McDermott] shall not be responsible or liable, as indemnitor or otherwise, for well damage or loss, reservoir damage or loss, *loss of use of any equipment of Sun or any other party,* or for any remote or consequential damages (as distinguished from direct and immediate damages). (Emphasis supplied.) See, Original Finding of Fact No. 7.

Accordingly, the Court finds that McDermott is not liable to indemnify Sun for the $71,781.38 in lost overhead incurred by SLAM.

9.

The damage to the Marathon pipeline occurred on December 20, 1969, and SLAM therefore sent a written notice of claim to Williams-McWilliams on December 22, 1969. See, Exhibit P–119. Suit was filed December 14, 1970. Williams-McWilliams pled the defense of Limitation of Liability under 46 U.S.C. 181, et seq. in its answer to the complaint on February 16, 1971; it likewise pled Limitation as a defense in its answer to Sun's cross-claim on March 12, 1971, and to McDermott's cross-claim on March 16, 1971. No Petition for Limitation was ever filed pursuant to 46 U.S.C. 185, and no bond or other security was ever posted on behalf of Williams-McWilliams.

10.

█ In December, 1969, Norman Southon was the Barge Superintendent of the Barge W–701, and was totally in charge of the barge while it was offshore. His immediate supervisor at Williams-McWilliams was Fred Lohman, who was the general superintendent of the Construction Division. Lohman's supervisor was William Rose, a Williams-McWilliams Vice-President, in charge of Offshore Construction Operations. Rose answered to Carl Hicks, who in turn answered to O. M. Gautreaux, the President of Williams-McWilliams. Thus, while Southon's knowledge of any mechanical defects or deficiencies in the Barge W–701 might be imputable to the corporation, his own personal negligence in operating the barge

would have had to have come into the knowledge of either Lohman or Rose, in order for the corporation to have imputed knowledge of Southon's negligence.

11.

Norman Southon was hired by Williams-McWilliams in 1955 as a journeyman rigging and ironworker on the barge HUMBLE DB–1. In 1959 he was promoted to Barge Superintendent, in charge of the EXXON DB–1, as well as the derrick barge W–701 in 1960. Within the Williams-McWilliams organization the term "Barge Superintendent" was synonymous with the term "Captain," to the extent that no one else was in charge of say, the Barge W–701, for purposes of navigation when Southon was on board. This is not to say that Southon actually navigated the Barge W–701, for it was a "dumb barge" with no motive power of its own, but rather, was towed from place to place by a tugboat. During actual movement, then, the navigation of the Barge W–701 was conducted solely by the captain of the tug, while once in place, Captain Southon was in charge of such matters as the placement and retrieval of anchors.

12.

At Williams-McWilliams there was no formal training program in such duties as the handling of anchors, but rather, an on-the-job training program was employed. Thus, in the four years that Norman Southon was a journeyman ironworker, he was under the constant supervision of his then superior, Mr. Mayhall, who trained Southon in all aspects of barge handling, including anchors. William Rose testified in his deposition of January 20, 1978, at p. 55 that Southon would not have been promoted to Barge Superintendent in 1959 if his supervisor had not thought him capable of handling the anchors of a derrick barge by himself. From 1960 until 1975 Norman Southon remained in charge of the W–701 until an automobile accident forced him to retire. In 1969, when Southon had been in charge of the W–701 for approximately ten

years, there has been only one known instance, other than the present one, where Southon had been found responsible for pulling up a pipeline with an anchor. William Rose testified in his deposition that in 1969 Southon had an excellent reputation in the field, and Rose was confident that Southon could handle the barge's anchors well. See, Rose deposition, p. 56.

### 13.

With respect to the placement and retrieval of anchors while a barge was in a pipeline area, it was Williams-McWilliams' policy that a Barge Superintendent, or Captain, should have an owner's representative on board the barge whenever the barge was operating in "unknown" waters. By "unknown" it was meant that the particular captain had never operated in that particular field before. See, Rose deposition, pp. 43–45. However, it has already been established in this Court's original decision on liability that, although no SLAM personnel were on board the W–701 the day Southon "dogged" the anchor, the location of the pipeline near Signal Platform A had been adequately pointed out to Captain Southon by those working on the project, and in fact, he knew where the Marathon pipeline was. See, Original Findings of Fact Nos. 12–14, and Conclusions of Law, p. 16, par. 3.

### 14.

With respect to what method would be employed in actually retrieving an anchor offshore when initial attempts meet with resistance, Williams-McWilliams has no specific rules or instructions on this, but leaves the decision to rest on the particular barge captain's experience and common sense. See, Rose Deposition p. 54. In December, 1969, William Rose knew that the Barge W–701 was going to be working at Signal Platform A around December 18–20, because Southon kept in daily contact with Rose. See, Transcript of Liability Trial, Vol. III, p. 594, 1. 10–13. However, on December 20, 1969, when Southon was in the middle of his problems with the port bow anchor and decided to utilize the "dog-ging" procedure, he did not stop in midstream and call Rose for permission to use the "dogging" method. In fact, Rose did not know there had been any trouble with the anchor until sometime on December 21, when the rupture was located. The Court finds that it would have been impractical to require Southon to call in for permission to use a particular procedure to retrieve an anchor he was in the process of having problems with, when it was just such an instantaneous decision that Williams-McWilliams expected a man with 10 years' experience to make on his own. It has already been determined, however, that under the circumstances which existed that day, it was negligent of Captain Southon to use the "dogging" method, and that such negligence was the sole proximate cause of the pipeline rupture. See, Original Finding of Fact No. 29, and Conclusions of Law, p. 17, par. 3–5.

### 15.

The Barge W–701 was built in 1960 by Avondale Shipyards for approximately $125,000. It measures 180 ft. by 60 ft. by 12 ft., and is outfitted with a steam-powered World War II vintage crane. Carl Hicks testified at the trial on damages as to each item of equipment added to the original barge since 1960, and by 1969 the barge had a total acquisition cost value (barge and equipment) of $350,250.00. Carl Hicks was the Williams-McWilliams executive in charge of getting hull insurance on its vessels, and he testified that between July, 1963, and July, 1968, the W–701 was insured for $350,000.00. From July, 1968, until July, 1969, it was insured for $400,000.00 and from July, 1969, until July, 1972, the barge was insured for $500,000.00 Hicks testified that he always tried to insure the Williams-McWilliams vessels for their approximate replacement cost in kind.

### 16.

In addition to Carl Hicks, the parties presented three expert witnesses on the issue of the value of the Barge W–701 in

1969.[1] Williams-McWilliams submitted the depositions of James Brooks and Andrew Allan, while McDermott submitted the deposition testimony of Richard Patton.

### 17.

James Brooks is the owner, manager and sole employee of Houston Barge and Boat Sales, which is a marine selling and chartering broker. He is also President of Houston Barge Rental Corporation, which owns either in whole or in part an interest in 12 rental deck barges. Brooks has been in the barge sales and rental business for approximately twenty years and has a good working knowledge of the fluctuations in market value of derrick barges during that time.

Brooks was deposed on February 23, 1978, and had only seen the W-701 for the first time that morning. However, he had previously been furnished with the specifications of the barge, and the acquisition cost of each item of equipment it contained, in the form of a letter to him by counsel for Williams-McWilliams. Brooks was quite candid in his deposition that he knew full well that Williams-McWilliams, or at least their attorneys, were hoping to get the 1969 value of the barge within the limits of their available insurance. However, Brooks proceeded, with that knowledge, to evaluate the W-701 strictly on the basis of the specifications and acquisition costs which were provided to him, as well as his own knowledge and experience with market values and contemporaneous sales of similar barges in 1969. Brooks concluded that a fair estimate of the 1969 value of the Barge W-701 would be $450,000.00.

### 18.

Andrew Allan was a naval architect with a degree from the College of Technology in Belfast, Ireland. He, too, had only seen the W-701 for the first time on the morning of his deposition, which was also taken on February 23, 1978, but he, too, had been provided with the same list of specifications and acquisition costs that counsel for Williams-McWilliams had supplied to Brooks. It should be noted that these figures were the same ones to which Carl Hicks of Williams-McWilliams testified live at the trial.

Allan used these figures as a guideline only. For example, although he knew that the crew quarters on the W-701 had actually cost Williams-McWilliams only $81,000.00, Allan used a 1969 replacement cost of $100,000.00, and depreciated that figure to $82,500.00. He knew that the 1940 steam crane's actual cost had been only $7,500.00, but he gave it a 1969 market value of $30,000.00. After similar assessments of each portion of the barge, and a visual assessment of the barge itself, Allan estimated that the W-701 had a 1969 new replacement cost of $580,000.00, which would give it a market value of $450,000.00.

### 19.

Richard Patton was also deposed on February 23, 1978. Although McDermott made much ado about the fact that Brooks and Allan had only just seen the W-701 that morning, Patton had only seen it once himself, and then only two months earlier on December 22, 1977. Additionally, Patton had no idea what items of equipment might have been on the barge in 1969, or what the

---

1. Although it is difficult to weigh the relative credibility of a witness from deposition testimony, the parties elected to so present all three experts. The Court, however, has tried to judge their credibility as best it can by viewing their testimony in light of what appear to be obvious tactical maneuvers on the part of those concerned.

First, the Court notes that the plaintiffs are seeking over $1 million worth of damages. The defendants, Sun and McDermott, have an uncontested direct action against only $500,000.00 worth of defendant Williams-McWilliams' insurance. Williams-McWilliams is seeking to limit its personal liability to the value of the barge, which it conveniently contends is less than $500,000.00. If limitation to that amount is allowed, and if Sun and McDermott cannot get a direct action against the $5,000,000.00 umbrella policy, then they will have to pay the remaining damages to SLAM in indemnity. Accordingly, Sun and McDermott conveniently argue that the value of the barge is over $1 million dollars. The significance of the Court's own observations will become clearer as the deposition testimony is discussed, infra.

acquisition cost of any item might have been.

Patton was employed by Matthews-Daniels Company, a marine surveying company. Although he testified that he surveyed as many as 50 vessels a year, he had only been a surveyor for three years, with two more years as a surveyor trainee with Hull and Cargo Surveyors in Houston. Patton is a 1970 graduate of Texas A & M, with one semester of naval architecture. In contrast to Allan's testimony, Patton valued the crew quarters of the W-701 at $200,000.00, undiscounted. He valued the World War II steam crane at $150,000.00, by comparing it to a diesel-powered crane on the barge RANGER, which crane sold in 1970 for $127,000.00. A January 7, 1970 survey of the RANGER, which measures 175 ft. by 60 ft. by 9.5 ft., gave the RANGER a market value of $300,000.00, with replacement value of $460,000.00. Patton also testified that the 1970 value of the barge MERRIMAC was $650,000.00, and that the 1969 value of yet another barge, similar to the W-701, was $450,000.00.

Nevertheless, Patton gave as a low estimate of the 1969 value of the Barge W-701 the figure of $1,310,000.00.

### 20.

After reading all three depositions, reviewing Carl Hicks' trial testimony, and weighing the relative candor, experience and methodology of Brooks, Allan, and Patton, the Court finds the 1969 value of the Barge W-701 to be $450,000.00.

Although the Court is aware of the possible motivations lurking behind the efforts of the parties, it feels that Brooks especially was very candid in his own assessment of those motives, and that he and the others tried their best to come to grips with a fair hindsight estimate of the barge's value in 1969. For whatever reason, Brooks and Allan had more pertinent information at their disposal than did Patton, and their methodology, combined with their training and experience, created a sound estimate in the Court's opinion. That soundness is buttressed by the fact that Patton acknowl-edged contemporaneous values of three similar barges with a range of from $300,000.00 to $650,000.00. This leads one logically to an average value for a barge of the type, and equipped, as the W-701 of about $450,-000.00. The leap from that figure to one of $1,310,000.00, as a *low* estimate, cannot be reconciled in the mind of the Court, and it therefore accepts $450,000.00 as the most realistic figure under the circumstances.

### 21.

Williams-McWilliams had three policies of insurance in effect which would have provided coverage for the liability which it incurred as a result of the rupture of the Marathon pipeline on December 20, 1969. Employers' Liability Assurance Corporation issued a primary policy, No. CL EG 9116-125, directly to Williams-McWilliams in Louisiana. That policy was in full force and effect on December 20, 1969, and had limits of $100,000.00. Employers' Surplus Lines Insurance Company issued its excess policy No. S-11-00980 directly to Williams-McWilliams in Louisiana. That policy had limits of $400,000.00. There was also in effect an umbrella excess policy which had Williams-McWilliams, as a division of Paramount Warrior, Inc., listed as an additional insured. Umbrella Policy No. EG 8559-001 of Employers' Liability Assurance Corporation was, however, issued in London and delivered directly to Zapata Norness in Houston, Texas, which was the parent company of Paramount Warrior, Inc. That policy had limits of $5,000,000.00, and covered literally dozens of Zapata's many divisions and subsidiaries all over the world.

### 22.

Richard J. Ford, a Vice President and Treasurer of Williams-McWilliams, testified by deposition that he was in charge of getting primary and first excess liability insurance for Williams-McWilliams, which operated solely out of Louisiana in the offshore oil industry. Thus, any policies which Ford secured named Williams-McWilliams as the sole insured under the policy, and the policy was delivered to Williams-McWil-

liams directly in Louisiana. However, the parent company, Zapata Norness, was in charge of umbrella excess insurance to cover all of Zapata's operations world-wide. These policies would list Zapata as the named insured with dozens of subsidiaries and divisions listed. as additional insureds. Such umbrella policies were delivered directly to Zapata at its Houston, Texas office.

### 23.

Umbrella Policy No. EG 8559–001 was issued from London, England, and delivered to the named insured, Zapata Norness, in Houston, Texas. Mr. R. W. Hover, Treasurer of Paramount Warrior in Houston, mailed to Richard Ford of Williams-McWilliams a recapitulation of the terms and coverages of the umbrella policy so that Ford would know the extent of the coverage it provided for Williams-McWilliams as an additional insured. Ford never saw Policy No. EG 8559–001.

### 24.

In keeping with its contractual obligations to McDermott, Williams-McWilliams would have its insurance agents sent to McDermott notices of Williams-McWilliams' insurance coverage at any given time. For the three policies at issue here, the following certificates, or advices, on insurance were issued:

On April 15, 1969, C. A. Sporl & Co., Inc., issued a certificate of insurance to McDermott advising them that Employers' Liability Assurance Corporation had issued Policy No. CL EG 9116–125 to Williams-McWilliams with limits of $100,000.00. See, Exhibit McDermott No. 10. Also on April 15, 1969, C. A. Sporl & Co., Inc., issued a certificate of insurance to McDermott which advised them that Employers' Surplus Lines Insurance Company had issued Policy No. S11–00980 to Williams-McWilliams, with excess property damage liability limits of $400,000.00 over Policy No. CL–EG–9116–125. See, Exhibit McDermott No. 13. On November 10, 1969, Johnson & Higgins of Louisiana, Inc. sent McDermott a document

entitled "Advice of Insurance" which informed McDermott that insurance had been issued by Employers' Liability Assurance Corporation covering "Williams-McWilliams Company Division of Paramount Warrior, Inc." This "Advice of Insurance" described the umbrella liability coverage of Policy No. EG 8559–001, which had limits of $5,000,-000.00. The "Advice" further stated:

> This Advice of Insurance neither affirmatively nor negatively amends, extends, or alters the coverage afforded by the policy issued by the company and referenced above.

See, Exhibit McDermott No. 15.

### 25.

In Richard Ford's deposition he states that before Zapata Norness acquired Williams-McWilliams, the Williams company got all of its insurance through Louisiana brokers C. A. Sporl & Co., Inc. After the corporate acquisition, Zapata decided to continue to obtain Williams-McWilliams' primary and first excess coverage through C. A. Sporl, but the Houston parent obtained umbrella coverage, not only for Williams-McWilliams, but for all of its divisions and subsidiaries, elsewhere. As of his March 6, 1978 deposition, Ford testified that he still dealt with C. A. Sporl for the primary insurance, while Zapata controlled the remainder from Houston. See, Ford deposition p. 19.

### 26.

With respect to the damages claimed by SLAM, the testimony at trial was that their average cost of borrowing money since 1969 to offset these damages was 13.4%. However, there was no testimony that any money was actually borrowed by SLAM in order to finance the repairs to the Marathon pipeline.

### CONCLUSIONS OF LAW

For the reasons stated in the above findings of fact, the Court finds that as a matter of law the entire amount of damages claimed by SLAM, i. e., $1,116,234.62, is recoverable. To the extent that Sun is a

10% owner of the Marathon pipeline they are entitled to either recover 10% of those damages, or to receive a 10% credit toward whatever amount they may be determined to owe SLAM in contractual indemnity.

Having determined that the full amount of the damages asked for are recoverable, the Court must now turn to the far more difficult task of unraveling who is going to pay what to whom. We shall commence with the issue of Limitation of Liability.

## LIMITATION

Under this Court's original liability decision, Williams-McWilliams was found to be the sole tort-feasor by virtue of Captain Southon's negligence in "dogging" the anchor of the Barge W–701 under the circumstances known to him on December 20, 1969. Although each was found to be non-negligent, Sun was determined to owe contractual indemnity to SLAM, and McDermott to owe contractual indemnity to Sun. Sun and McDermott were then determined to be entitled to maritime tort indemnity from Williams-McWilliams. This means that, ideally, SLAM would recover all of its damages from Williams-McWilliams (with 10% going to Sun), and Sun and McDermott would pay nothing. However, if Williams-McWilliams were found to be entitled to limit its liability to the value of the Barge W–701, and that value was determined to be less than the full amount of the damages, then the indemnity liability of Sun and McDermott would be activated.

Williams-McWilliams has pled the defense of Limitation of Liability, 46 U.S.C. 181, et seq., in its answers to the original complaint and to the cross-claims of Sun and McDermott. Under 46 U.S.C. 183 a vessel owner is entitled to limit its liability for any loss incurred without its privity or knowledge to the value of the vessel and its pending freight at the time of the accident in question. Under 46 U.S.C. 185 the vessel owner may file a petition for limitation of liability within six months of a written notice of claim, and, when filing such a petition, he must either put the vessel in trust or file security with the Court in the amount of the vessel's value for the benefit of the claimants. Section 185 provides that, "Upon compliance with the requirements of this section all claims and proceedings against the owner . . . shall cease."

The first wave of attack upon Williams-McWilliams' claim to limitation is that since it did not file a § 185 petition within six months of SLAM's notice of claim dated December 22, 1969, and since it failed to post the requisite security, it has no right to plead limitation at all. This attack is coupled with the argument that the right to limit under § 183 can only be invoked by means of a § 185 petition, and that it cannot be raised as a defense in an answer. These arguments are without merit for the following reasons.

The law is now well settled that the right to limit under § 183 may be pled as a defense in one's answer, and that a vessel owner need not file a § 185 petition. *Odegard v. E. Quist, Inc.,* 199 F.Supp. 449 (E.D. N.Y.1961); *Baham v. Atlantic, Gulf and Pacific Company,* 333 F.Supp. 680 (E.D.Pa. 1971); *Blunk v. Wilson Line of Washington, Inc.,* 341 F.Supp. 1345 (N.D.Ohio 1972). Furthermore, neither the six months period for filing, nor the requirement for bond or security of a § 185 petition applies to a § 183 defense raised by way of answer. *Federazione Italiana v. Mandask Compania,* 223 F.Supp. 206 (S.D.N.Y.1963), aff'd. in part, rev'd. in part (on other grounds) 342 F.2d 215 (2d Cir. 1965); Gilmore & Black, *The Law of Admiralty* (2d Ed. 1975), p. 855.[2]

2. SLAM cited the decision in *Cincinnati Gas and Electric v. Abel,* 533 F.2d 1001 (6th Cir. 1976), cert. den. 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 136 for the proposition that limitation may only be raised by means of a timely filed § 185 petition; however, a close reading of that decision shows that it was in fact dealing with the special problems which arise when limitation is raised by an answer to a state court proceeding. For a complete discussion of these problems, see Volk & Cobb, *Limitation of Liability,* 51 Tul.L.Rev. 953 (June 1977), at pp. 974–977.

■ The next argument is that by pleading limitation in separate answers to the cross-claims and the main demand, Williams-McWilliams has created multiple limitation funds. The 1949 decision of *The West Point,* 83 F.Supp. 680 (E.D.Va.) is cited as authority for this contention.

The decision in *The West Point* was reached with only a cursory analysis, at best, of the Limitation Act, and did not resurface in reported decisions for nearly twenty-five years. After a much more thorough review of both the Act and its legislative history, the multiple fund result of *The West Point* was soundly rejected in the 1972 decision of *Blunk v. Wilson Line of Washington, Inc., supra.* The *Blunk* decision has been cited with approval by the commentators. See, Gilmore & Black, supra, at pp. 858–859; and Volk & Cobb, *Limitation of Liability,* 51 Tul.L.Rev. 953, 977–978 (June, 1977). In *Blunk* the court was faced with a consolidation of some forty complaints by schoolchildren who had been passengers on an excursion vessel which had run aground. The vessel owner elected to seek limitation by means of answer, and the plaintiffs therefore argued that this created forty different limitation funds, citing *The West Point.* The *Blunk* court rejected the argument after a thorough analysis of the Limitation Act, feeling that such an interpretation would render 46 U.S.C. 183 meaningless. This Court agrees, and therefore holds that should limitation be granted here, there will be only one limitation fund for both the cross-claims and the main demand.[3]

■ As a final attempt to nip limitation in the bud, McDermott asserts that, in any event, Williams-McWilliams cannot limit as to it because of the so-called "personal contract" doctrine. Pretermitting whatever merits this argument might otherwise have had, the Court notes that it cannot be applied in the instant case because McDermott's right to recover in indemnity from Williams-McWilliams is based on maritime tort indemnity, and not on any breach of a personal contract with McDermott. See, Original Conclusions of Law, pp. 20–21; and generally, Gilmore & Black, supra, at pp. 904–905.

■ This brings us to the question of whether Williams-McWilliams had privity with or knowledge of Captain Southon's negligence in "dogging" the anchors of the W–701 on December 20, 1969, for it is only if Williams-McWilliams can prove itself innocent of such privity or knowledge that it is entitled to the benefit of limited liability under 46 U.S.C. 183. See generally this Court's recent opinion in *Matter of State of La., Dept. of Highways,* 455 F.Supp. 272, 281–282 (E.D.La.1978).

It must be remembered that the original decision of this Court found the sole proximate cause of the pipeline rupture to have been Southon's negligence in using a particular method of anchor retrieval under the circumstances with which he was faced on December 20, 1969. The Court found no unseaworthiness and no defective barge equipment. Therefore, to the extent that the parties make arguments against limitation on the basis of either unseaworthiness or defective barge equipment, those arguments are rejected.

■ However, the parties make the additional argument that Captain Southon was not merely negligent, he was incompetent since he lacked formal training in either navigation or anchor handling. From there, the parties argue that William Rose had personal knowledge of Southon's incompetence, which knowledge is imputable to the corporate vessel owner. *The Linseed King,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932); *Avera v. Florida Towing Corp.,* 322 F.2d 155 (5th Cir. 1963). To the contrary, on the facts found above it is clear that Captain Southon was not incompetent but merely negligent.

---

**3.** Although this interpretation seems to create no advantage for a vessel owner in filing a § 185 petition with its six months' filing limit and requirement of security, the obvious procedural advantages which § 185 provides for concursus proceedings are well illustrated by the *Cincinnati Gas* case, *supra.*

Although it is true there was no formal training provided to Southon in either navigation or anchor handling, the on-the-job training which was provided to him created an obviously capable man with an excellent reputation, whose record reflected only one other such instance of pipeline damage in ten years on the job. As for navigation training, Southon had no need to be trained in navigation per se since the barge was always towed by a tugboat whose captain was in charge of navigation. On the present record the Court feels this case clearly falls within the holding of the Fifth Circuit in *Farrell Lines v. Jones*, 530 F.2d 7 (1976), where the Court states at p. 12:

> In sum, neither the absence of an additional watch officer nor the location of the rudder angle indicator involved negligence or rendered the vessel unseaworthy. Although the presence of an additional officer or the relocation of the indicator might have reduced the possibility of collision, that is not the standard by which we are to determine whether *Farrell* is entitled to limitation. Rather, we must ask whether the procedures and equipment utilized rendered the vessel *reasonably* fit under the circumstances. Here, we conclude . . . that the vessel as equipped was reasonably capable of performing the intended mission if properly operated. The accident resulted from lack of care and failure to exercise proper procedures by those on the bridge. For this *Farrell* is liable, but it is also entitled to limit. (citations omitted).

Here, too, Southon's negligence in "dogging" the anchor may be something for which Williams-McWilliams is liable, but for which it is also entitled to limit. The Court has already concluded that the 1969 value of the W–701 is $450,000.00. Since there was no pending freight within the meaning of 46 U.S.C. 183, that amount shall constitute the limitation fund.

## INSURANCE

The foregoing analysis now brings us to the question of the insurance proceeds covering the liability of Williams-McWilliams. Insurance proceeds as such are not subject to the owner's right to limit, and therefore not technically a part of the limitation fund, *The City of Norwich*, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134 (1886). However, the vessel owner does have an interest in not having the proceeds exhausted by the claimants before the extent of his own liability can be covered by them, *Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954). Therefore, the formula has been established whereby once the amount of the limitation fund has been determined, the insurer pays the proceeds into the fund up to the maximum limit of the fund, the claimants are paid their pro rata share of the fund, and they then proceed directly against the remainder of the insurance proceeds for the remainder of their claims. *Maryland Casualty Co. v. Cushing, ibid.* This analysis, of course, assumes that a claimant has a right of direct action against the vessel owner's insurer under a statute such as L.R.S. 22:655.

L.R.S. 22:655 provides in part:

> . . . The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido . . . . This right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not . . . provided the accident or injury occurred within the State of Louisiana. . . .

The cited language has been construed by the Louisiana Supreme Court to mean that in order for an injured third party to sue a tort-feasor's insurer directly, *either* the accident or injury must have occurred in Louisiana *or* the policy must have been written or delivered in Louisiana. *Webb v. Zurich Insurance Co.*, 251 La. 558, 205 So.2d 398 (1967). In the present case it is uncontested that the rupture to the Marathon pipeline occurred offshore beyond the territorial lim-

its of Louisiana. It is further uncontested by the defendant insurers that both the primary and the first layer excess policies issued to Williams-McWilliams are covered by L.R.S. 22:655 because each was delivered to Williams-McWilliams in Louisiana. However, defendant Employers' Liability Assurance Corporation maintains that its Umbrella Policy No. EG 8559–001 does not fall within the ambit of that statute because it was neither written nor delivered in Louisiana. The insurer justifiably takes this position because the policy was written in London and delivered in Houston, Texas. The following counter arguments are made by SLAM, Sun and McDermott.

First, it is argued that since the umbrella policy by its terms is a continuation of the first two policies, it was thereby "constructively delivered" in Louisiana. No legal authority was cited for this proposition and the Court can find none; therefore, it is rejected.

Second, it is argued that countersignature of the policy under Louisiana law has made the policy a Louisiana contract covering a business, Williams-McWilliams, which has more than minimum contacts with Louisiana, and therefore the Direct Action Statute should apply to the umbrella policy. However, the Louisiana courts have consistently held that the minimum contacts necessary to hold a foreign insurer liable to personal jurisdiction are not the same as the contacts required for a right of direct action under L.R.S. 22:655. Unless the policy in question was written or delivered in Louisiana, or the accident occurred here, there is *no* right of direct action no matter how many other Louisiana statutes the insurer has complied with, or how many other contacts it may have here. *Esteve v. Allstate Ins. Co.*, 351 So.2d 117 (La.1977); *Easterly v. Dynamic Enterprises, Inc.*, 334 So.2d 467 (La. 1st Cir. 1976); *Cambre v. St. Paul Fire & Marine Ins. Co.*, 331 So.2d 585, 588–589 (La. 1st Cir. 1976), writ refused 334 So.2d 434, 435; *Kirchman v. Mikula*, 258 So.2d 701, 703 (La. 3d Cir. 1972).

Third, it is argued that the certificates, or advices, of insurance issued to McDermott and evidenced by McDermott Exhibits Nos. 10, 13 and 15 are conclusive proof that all three policies were actually delivered to Williams-McWilliams in Louisiana, and that the insurer is now estopped from denying such delivery. In making this argument the parties rely on the case of *Sassoni v. Savoie*, 327 F.Supp. 474 (E.D.La.1971) which held that where a certificate of insurance was delivered in Louisiana then L.R.S. 22:655 provided a direct action against the insurer even though the accident occurred offshore. The problem with this argument is that the *Sassoni* case was apparently dealing with a "binder" of insurance delivered to the insured, Leslie Savoie, in Cut Off, Louisiana (see 327 F.Supp. at 475–476), whereas here we are presented with "advices" confirming the existence of insurance to a third-party, McDermott, and not delivered to the insured. (McDermott Exhibits Nos. 10, 13 and 15 show the advices on insurance were delivered to McDermott in Louisiana.) Hence, this final argument is also without merit.

Since Umbrella Policy No. EG 8559–001 was neither written nor delivered in Louisiana, nor did the accident occur here, SLAM, Sun and McDermott have no right to a direct action under L.R.S. 22:655 against Employers' Liability Assurance Corporation, and it is therefore entitled to judgment in its favor, dismissing the demands of those parties.

### PRE–JUDGMENT INTEREST

SLAM has sought to have its damages award against the defendants herein subject to pre-judgment interest at a rate of 13.4%, to run from the date of the loss, December 20, 1969. The prevailing legal rate of interest is 7%; however, at the trial on damages, Don Peppers testified that 13.4% was the average cost of borrowing money for the SLAM group from December, 1969, to February, 1978, when the damage issues were tried. SLAM therefore argues that they are entitled to recover their damages at this greater interest rate under the holding of *Complaint of M/V Vulcan*, 553 F.2d 489 (5th Cir. 1977). The Court

disagrees. Although it is true that the *Vulcan* decision allowed an award of interest greater than the prevailing legal rate in order to reflect the complainant's real cost of borrowing money, the SLAM group offered no evidence at trial that any money was actually borrowed in order to make the necessary repairs to the Marathon pipeline. Accordingly, the Court will award interest only at a rate of 7%. Since it is the rule, rather than the exception, that pre-judgment interest is awarded in maritime cases, to run from the date of the loss, *Complaint of M/V Vulcan, supra,* the Court will award damages here at 7% interest to run from December 20, 1969.

As a final note on the indemnity claims of Sun and McDermott, each has submitted affidavits of counsel as to the amount of attorney fees, costs and expenses that were incurred as a result of this litigation. These affidavits were uncontested and the Court will therefore use the figures contained therein in making its judgment.

McDermott made a final effort to escape liability to Sun in indemnity by quoting at p. 24 of its post-trial brief language to the effect that any indemnity obligation incurred by McDermott on account of its own negligence would be limited to the amount of its insurance. McDermott therefore argues that since it was held to be non-negligent, it owes Sun nothing, and in any event no more than its insurance limits. The Court does not agree. First, the language cited comes from McDermott's rental rate agreement, and not from its contract with Sun, Clauses 11 and 15 of which were relied on in the original decision on liability. See, Original Finding of Fact No. 7. Second, clause 11 of the contract requires indemnity from McDermott whether it is negligent or not, unless excepted by clause 15. See, Original Conclusions of Law, p. 19. The Court has found herein that McDermott is not liable under clause 15 to indemnify Sun for any expenses related to lost overhead by SLAM, and the judgment will so reflect. See, Finding of Fact No. 8. Therefore, McDermott is entitled to no other limitations.

Accordingly, IT IS HEREBY ORDERED that JUDGMENT be entered herein in accordance with this opinion.